IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DONALD C. HENNESSEY, JR.,　　　　)
　　　　　　　　Plaintiff,　　　　　)
　　　　　　　　　　　　　　　　　　)
　　vs　　　　　　　　　　　　　　　)　　　Civil Action No. 18-977
　　　　　　　　　　　　　　　　　　)
DOLLAR BANK, FSB,　　　　　　　　)
　　　　　　　　Defendant.　　　　　)

## MEMORANDUM OPINION AND ORDER

Currently pending before the Court is Defendant's motion for summary judgment. For the reasons that follow, its motion for summary judgment will be granted.

### I.　Relevant Procedural History

On or about April 11, 2017, Plaintiff Donald C. Hennessey, Jr. ("Plaintiff") filed a charge of racial and age discrimination with the Equal Employment Opportunity Commission ("EEOC"). (Compl. ¶ 2(a).) The EEOC issued a Notice of Right to Sue on April 25, 2018. (Compl. ¶ 2(b).)

Plaintiff commenced this action against Defendant Dollar Bank, FSB ("Dollar") on July 24, 2018. In his Complaint, he alleges claims of racial discrimination under 42 U.S.C. § 1981 (Count I) and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17 (Title VII) (Count III) , as well as a claim of age discrimination under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621-34 (ADEA) (Count II).[1]

Discovery closed on February 19, 2019. Thereafter, on March 19, 2019, Dollar moved for summary judgment (ECF No. 19). This motion has been fully briefed and is ripe for resolution.

---

[1] In response to Dollar's motion for summary judgment, Plaintiff advised that he is no longer proceeding with the ADEA claim. (ECF No. 25 at 3 n.1.)

## II.  Factual Background

### A.  Plaintiff's Employment with Dollar

Plaintiff, a Caucasian male, was employed by Dollar from June 2000 until he was terminated in January 2018. (Compl. ¶ 3; Plaintiff Dep. 21:3-9.[2]) After working as a Senior Teleprocessing Technician from June 2000 until June 2005, he became a Senior Computer Operator in June 2005 and worked in that position until his termination in January 2018. (*Id.* at 10:6-11:17; Pl.'s App Ex. 2.)

As part of his employment with Dollar, Plaintiff received a copy of Dollar's Employee Guide in 2008 and 2017. (Plaintiff Dep. 21:15-22:16, 24:12-25:4.) Both versions included a Harassment Policy and a Code of Ethics. (Plaintiff Dep. Exs. 3, 5.)[3]

The 2017 Harassment Policy states in part that Dollar is "committed to providing a work environment free of discrimination and unlawful harassment" and that all employees "should be free from all forms of illegal harassment, including offensive language and behavior regarding an individual's race, religion, color, age, sex, sexual orientation, gender identity, national origin, ancestry, physical or mental disability, medical condition, marital status or any other legally protective [sic] status." (Plaintiff Dep. Ex. 5 at 9.) The Policy further provides that: "Employees should consider their behavior and comments from the perspective of anyone who might be offended by them." (*Id.*) Plaintiff understood that he was required to consider his behavior and comments from the perspective of anyone who might be offended by them. (Plaintiff Dep. 23:23-24:8.)

The Harassment Policy prohibits "visual forms of harassment" and advises employees

---

[2] Unless otherwise indicated, all excerpts from Plaintiff's deposition are contained in Plaintiff's Appendix (ECF No. 28), Ex. 1.
[3] Def.'s App. (ECF No. 22) Ex. A.

that disciplinary action, up to and including termination, can result from a violation of this Policy. (Plaintiff Dep. Ex. 5 at 9.)

Dollar's Code of Ethics provides that employees must be courteous to each other and that employees are required to conduct their duties in a professional manner. (*Id.* at iii-iv.) *See also id.* at ii (notifying employees that "violation of any Dollar Bank policy will subject you to disciplinary action, up to and including termination.") Plaintiff understood these requirements. (Plaintiff Dep. 23:12-18, 25:18-26:8.)

As a Senior Computer Operator, Plaintiff worked in the computer room at Dollar's Liberty Commons location (Plaintiff Dep.12:12-17, 16:15-21), which houses its call center and operations. (*Id.* at 12:23-13:4.) The computer room is an open-air room that is partitioned for computer operations, the help desk, the tape library, the LAN room and the print room and requires a badge to access. (*Id.* at 16:18-25, 17:19-25.) The computer room has a wire rack with bars across it hanging from the ceiling. (Mangis Dep. 14:16-19; Romano Dep. 24:11-18.)[4]

Different classifications of employees worked in the computer room, including computer operators, help desk employees, tech support, mailroom employees and programmers. (Plaintiff Dep. 17:16-19:5.) Several of these employees were African American, including Ronda Johnson, a computer operator, Gary Brown, head of the mailroom, and Doug Jackson, a Senior Computer Operator, as well as two or three programmers and one tech support person. (*Id.* at 15:5-6, 16:13, 20:16-25; Mangis Dep. 28:19-21; Herring-Myers Dep. 17:2-6[5]; Wolfe Dep. 15:13-19[6]; Jackson Dep. 6:7.[7])

---

[4] Def.'s App. Exs. C, D.
[5] Unless otherwise noted, all excerpts from Ms. Herring-Myers' deposition and the exhibits thereto are contained in Defendant's Appendix Ex. E.
[6] Def.'s App. Ex. F.
[7] Def.'s App. Ex. G.

B. Events Leading to the Incident at Issue

On January 9, 2018, his day off, Plaintiff purchased a stuffed monkey from Walmart while shopping with his wife. Plaintiff stated that he found this stuffed animal in a Valentine's Day display even though the monkey was brown and did not include any Valentine's Day decorations. (Plaintiff Dep. 37:10-41:25; Pl.'s App. Ex. 3; Plaintiff Dep. Ex. 12.[8]) Plaintiff selected it over the other items in the Valentine's Day display because it was the only one that had Velcro on its paws so that it could be hung from the wire rack in the computer room. (Plaintiff Dep. 39:6-22.)[9] At the time he purchased it, Plaintiff told his wife he thought the monkey would look cute hanging from the rack. (*Id.* at 40:22-25, 41:11-19.)

Although he had taken decorations into work before, neither Plaintiff nor anyone else had ever hung any decorations from the wire rack. (*Id.* at 40:1-12, 41:3-6; Wolfe Dep. 16:16-18.)

Although Plaintiff's next day of work after his purchase was Friday, January 12th, he did not bring the monkey to work until Saturday, January 13. (*Id.* at 41:23-42:7.) Unlike January 12, when four other employees were working, the only other person working that day was Shawn Wolfe, also Caucasian, a Service Desk Analyst who shared a cubicle with him. (*Id.* at 42:8-21, 43:2-6; Wolfe Dep. 6:8-12, 8:2-3.) Plaintiff hung the monkey on the wire rack by attaching the Velcro on its hands around the wire. (*Id.* at 44:15-18, 45:1-11.) Plaintiff had no discussions with Wolfe while he was doing so. (*Id.* at 45:18-20.)

Plaintiff was the only person working in that area on Sunday as well as on Monday, which was Martin Luther King, Jr. Day. (*Id.* at 42:23-44:11; 47:16-19.) He was then off for the next three days as part of his regular work rotation. (*Id.* at 47:25-48:14.)

---

[8] Def's App. Ex. A.
[9] Defendant denies this statement on the ground that Plaintiff's testimony is "not credible." (ECF No. 30 ¶ 18.) However, in the context of a motion for summary judgment, the Court does not make credibility determinations.

Plaintiff stated that he was unaware that monkeys can be a derogatory image for African Americans. (*Id.* at 49:13-21.) He acknowledged, however, that it would have been inappropriate if he had hung the monkey by a rope around its neck. (*Id.* at 65:3-13.)[10]

On Tuesday, January 16, 2018, Ms. Johnson discovered the monkey hanging from the rack. (Herring-Myers Dep. Ex. 4.) She tried to remove it, but could not reach it, so she asked Mr. Brown to remove it. (*Id.*) Mr. Brown "yanked" the monkey down and "threw" it on the file cabinets, demanded to know who had hung it, and then took the monkey with him, telling Ms. Johnson that if anyone was looking for it, he had it. (*Id.*; Herring-Myers Dep. Ex. 2.)

Ms. Johnson, who was still upset, reported the incident to Nick DeFazio, Plaintiff's supervisor, and Phil Mangis, Dollar's Vice President of Information Systems. (Mangis Dep. 7:10-11, 9:16-25, 15:2-4, 10-12, 15:25-16:3, 16:23-25; Herring-Myers Dep. Ex. 4.) Mr. Mangis then spoke with Mr. Brown, who was also agitated, and retrieved the monkey from him. (*Id.* at 17:9-13, 18:12-14, 19:4-5.) Ms. Johnson later told Mr. Wolfe that this action was inappropriate because of the Martin Luther King, Jr. holiday. (Wolfe Dep. 14:13-21; Jackson Dep. 9:2-8, 10:10-11.) By contrast, Mr. Jackson, who is also African American, was not offended and did not believe it was a racial statement. (Jackson Dep. 9:12-10:1.) He would have reacted differently if the monkey was hanging from a noose because it is symbolic of lynching. (*Id.* at 10:18-11:15.)[11]

When Plaintiff returned to work the monkey was no longer there. (Plaintiff Dep. 47:25-48:25.) He did not discuss the issue with anyone or think much about it. (*Id.* at 48:22-49:8.)

C. Dollar's Investigation

Mr. Mangis reported the incident to Stephanie Herring-Myers, Vice President of Human

---

[10] Def.'s App. Ex. A.
[11] Pl.'s App. Ex. 11.

Resources, and gave her the monkey. (Mangis Dep. 14:11-19, 19:6-20; Herring-Myers Dep. 16:15-18.) Ms. Herring-Myers is African American. (Plaintiff Dep. 50:15-18.) Mr. Mangis informed Ms. Herring-Myers that there are cameras in the facility and recommended that she review the tapes to identify the perpetrator. (Mangis Dep. 20:4-7.)

Ms. Herring-Myers spoke with Ms. Johnson, who sobbed throughout their conversation. (Herring-Myers Dep. 19:20-20:1; 20:4-22.) While Ms. Johnson concluded that Plaintiff was the person responsible, Ms. Herring-Myers stated that no one should make this assumption but reassured her that Dollar would investigate the incident. (*Id.* at 20:17-22.)

Ms. Herring-Myers next spoke with Mr. Brown. (*Id.* at 22:12-25.) Mr. Brown also told Ms. Herring-Myers that he assumed it was Plaintiff who had hung the monkey. (*Id.* at 23:2-7.) Ms. Herring-Myers told Mr. Brown that she was conducting an investigation and they could not make any assumptions at that point. (*Id.* at 23:12-17.)

Ms. Herring-Myers did conduct an investigation, which included interviews, soliciting written statements, speaking with department heads and working with corporate security to have videotape information obtained. (Herring-Myers Dep. 12:12-23.) In addition to Ms. Johnson and Mr. Brown, she spoke to Mr. Mangis, Mr. Wolfe and David Campbell, the head of Corporate Security, and received written statements from Mr. Jackson, Mr. Wolfe, Richard Kaniecki and John Sobolslay. (*Id.* at 13:11-21, 14:13-19, 15:21-25.)[12] Richard Romano, a security investigator reviewed video of the work area on the date in question and observed an employee hanging the monkey, after which he provided still photographs to Ms. Herring-Myers. (*Id.* at 11:22-12:3, 13:8-9.) The video footage confirmed that Plaintiff hung the monkey. (Herring-Myers Dep. 26:7-

---

[12] All but one of the written statements were obtained by Ms. Herring-Myers after Plaintiff was terminated. (Herring-Myers Dep. 39:3-41:2, 55:22-56:11; 56:22-57:13, 60:7-23; Pl.'s App. Exs. 8-10, 12.)

9.)

D. Plaintiff's Termination

On Thursday, January 25, 2018, Ms. Herring-Myers called Plaintiff at home and told him to report directly to Human Resources the next day. (Plaintiff Dep. 50:1-4, 51:15-19.) Plaintiff met the next day with Ms. Herring-Myers and Mr. Romano. (*Id.* at 50:14-15.)

Ms. Herring-Myers told Plaintiff that they had recovered video of him hanging the monkey and showed him the still pictures. (*Id.* at 50:7-11.) She explained that the purpose of the meeting was to hear Plaintiff's side of the story and to validate the information that had been collected so far in the investigation. (Herring-Myers Dep. 30:6-13.) However, the decision to terminate him had already been made. (Herring-Myers Dep 37:20-23; 41:23-42:9.) *See also id.* at 42:15-47:4; UC Hr'g at 21.[13] Ms. Herring-Myers advised Plaintiff that he had offended Ms. Johnson and Mr. Brown and that she was also personally offended as a black woman.[14] (Herring-Myers Dep. 50:14-19, 19-22; 53:2-9.) Plaintiff asked how this offended anyone and Ms. Herring-Myers told him because monkeys are associated with black people. (Plaintiff Dep. 56:17-25.) While Plaintiff concluded that he was being accused of being a "white racist," he admits that he was not called a racist during the meeting. (Plaintiff Dep. 80:3-5, 81:8-10.)

The parties dispute whether Plaintiff told Ms. Herring-Myers that he had purchased the monkey as a Valentine's Day decoration. He claims that he did so (*Id.* at 55:9-14) while she denies that he made this statement (Herring-Myers Dep. 51:8-14.)[15] Mr. Romano claims that

---

[13] Herring-Myers Dep. Ex. 3.

[14] Ms. Herring-Myers used pink and white monkeys hanging on her front door and windows as a Valentine's Day decoration. (Herring-Myers Dep. 54:25-55:13.) When asked if it would have been an issue if Plaintiff had hung a pink monkey over the holiday, she was unable to answer because she didn't "know his train of thought." (*Id.* at 55:17-21.)

[15] While not dispositive, it is noted that the Unemployment Compensation Referee specifically found as a fact that Plaintiff "never informed the employer that the monkey was hung on the

Plaintiff stated that he hung the monkey as a joke, but Plaintiff also denies making this statement. (Plaintiff Dep. 52:17-53:25.)

Plaintiff provided an explanation for his conduct before he was terminated. (*Id.* at 61:10-15.) Ms. Herring-Myers confirmed that "the decision had been made to terminate" him before their meeting but she gave him an opportunity to defend himself and to say something to reverse the decision. (Herring-Myers Dep. 37:20-23, 41:43-42:9.)[16]

After Plaintiff discussed the circumstances surrounding the hanging of the monkey, he was informed that he had violated Dollar's Code of Conduct and Harassment Policy and that his employment was being terminated. (Herring-Myers Dep. 50:23-51:4, 52:9-24;[17] Plaintiff Dep. 61:16-21; Romano Dep. 25:6-9.) Ms. Herring-Myers, who made the decision to terminate his employment, did not require the approval from any other Dollar employee to do so. (Herring-Myers Dep. 11:12-12:11.)

E. Post-Termination Events

It is undisputed that after Plaintiff was terminated, Jerome Gibson, who is African American, was hired by Dollar. However, the parties dispute whether Mr. Gibson replaced Plaintiff or if his job duties were redistributed and absorbed by other Dollar employees. In fact, the record includes contradictory information from Dollar on this issue. *See, e.g.,* Mangis Dep. 9:16-10:9, 11:5-14, 11:19-12:15; Pl.'s App. Exs. 16, 9-20; Herring-Myers Dep. 65:11-12; ECF No. 30 ¶¶ 157-72. Therefore, a genuine issue of material fact exists regarding whether Mr. Gibson was hired to fill Plaintiff's position and duties.

---

overhead rack for Valentine's Day." (Def.'s App. Ex. H, Ex. 1 at DH000078 ¶ 8.)
[16] Plaintiff contends that this testimony contradicts what Ms. Herring-Myers stated at the Unemployment Compensation hearing. This issue is discussed below.
[17] Pl.'s App. Ex. 6.

F. The Unemployment Compensation Proceeding

After his termination, Plaintiff applied for unemployment compensation benefits. (Moon Dep., Def.'s App. Ex. H, Ex. 1 at DH000039-46.) His documentation was reviewed by Carol Moon, an Assistant Vice President of Human Resources for Dollar, because one of her primary duties is to represent the bank at unemployment compensation hearings. (Moon Dep. 7:5-6, 12:5-13.)[18] Ms. Moon reports directly to Ms. Herring-Myers. (*Id.* at 8:9-16.)

Before Ms. Moon completed the documents to be submitted in connection with Plaintiff's application, she discussed with Ms. Herring-Myers the incident that led to his termination. (*Id.* at 13:7-14.) Ms. Herring-Myers told Ms. Moon that "Mr. Hennessey had hung a monkey up on a rack with a rope wrapped around its neck." (*Id.* at 14:4-6.)

Ms. Moon partially completed the employer's notice of application regarding Plaintiff's application for benefits (*Id.* at 16:1-23; Moon Dep. Ex. 1 at DH000023.), including the response to the question regarding the reason for Plaintiff's termination. (*Id.* at 17:2-10.) In that response, she identified "misconduct" as the reason and noted "see attached." (*Id.* at 16:24-17:7.) The attachment stated:

> Claimant was observed on video footage and still screen photos with a dark brown monkey, wrapping a rope around its neck and hanging it on a wire, where it was visible for employees to see. This is a menacing act of intimidation, for there would be no other reason to commit such an act.

(Moon Dep. Ex. 1 at DH000029.) She relied on Ms. Herring-Myers to create the content of this addendum. (*Id.* at 19:1-20:3.) Ms. Herring-Myers admits that she provided this incorrect information to Ms. Moon. (Herring-Myers Dep. 62:1-6, 63:7-14.)

Ms. Moon did not learn until she was preparing for the unemployment compensation

---

[18] Unless otherwise noted, all excerpts from Ms. Moon's deposition are contained in Plaintiff's Appendix Ex. 14.

hearing that the monkey was hanging by its hands rather than a rope. (Moon Dep. 20:5-20.)[19],
While she knew about her obligation to provide true and correct information (Moon Dep. 18:4-
10, 23:23-24:19; Moon Dep. Ex. 1 at DH000034-35.), she took no steps prior to the
unemployment compensation hearing to inform anyone that the information Dollar had
submitted was untrue. (*Id.* at 20:22-21:20.) She claims that she did not do so because she knew
she would have an opportunity to correct the false information during the hearing. (*Id.* at 22:6-
22.)

At the Unemployment Compensation hearing on April 3, 2018, Mr. Romano, Ms.
Johnson and Mr. Brown all testified that the monkey was hanging by its hands. (UC Hr'g at 11,
15, 18.) Only upon being asked by Plaintiff's counsel during the hearing did Ms. Moon
acknowledge that the written statement she had provided about the monkey being hung from its
neck by a rope was inaccurate. (*Id.* at 27.)

On April 10, 2018, the Unemployment Compensation Referee denied Plaintiff's appeal
of his denial of benefits. (Moon Dep. Ex. 1 at DH000077-80.)[20] Plaintiff's subsequent appeal to
the Unemployment Compensation Board of Review was also denied. (*Id.* at DH000074.)

## III.   Discussion

### A.   Standard of Review

The Federal Rules of Civil Procedure provide that: "The court shall grant summary
judgment if the movant shows that there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Summary judgment may

---

[19] Again, Plaintiff claims that this statement is "disputed" because Ms. Moon is an interested
witness (ECF No. 27 ¶ 106), but points to no evidence to the contrary.

[20] Among other things, the Unemployment Compensation Referee found that the monkey was
attached to the wire rack with Velcro. (Moon Dep. Ex. 1 at DH000078.)

be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In following this directive, a court must take the facts in the light most favorable to the non-moving party, and must draw all reasonable inferences and resolve all doubts in that party's favor. *Hugh v. Butler County Family YMCA*, 418 F.3d 265, 266 (3d Cir. 2005); *Doe v. County of Centre, Pa.*, 242 F.3d 437, 446 (3d Cir. 2001).

### B. Plaintiff's Racial Discrimination Claims

In moving for summary judgment, Dollar contends that Plaintiff cannot maintain a prima facie case of reverse discrimination because he has not pointed to similarly situated non-white employees who received more favorable treatment or to circumstances that would support an inference of unlawful discrimination. Dollar also asserts that it has proffered a legitimate, non-discriminatory reason for Plaintiff's termination and he has failed to counter with evidence that this reason is a pretext for unlawful racial discrimination.

Plaintiff counters that has set forth a prima facie case of discrimination, both because there is no heightened standard for reverse discrimination claims and because Dollar replaced

11

him with an African American employee. He further asserts that he has proffered sufficient evidence of pretext to preclude summary judgment.

### 1. Prima facie burden

"Section 1981 prohibits 'racial' discrimination in the making of private and public contracts." *Pamintuan v. Nanticoke Mem. Hosp.*, 192 F.3d 378, 385 (3d Cir. 1999). Similarly, Title VII provides that "It shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race..." 42 U.S.C. § 2000e-2(a)(1).

In the absence of direct evidence of discrimination, a plaintiff may utilize the *McDonnell Douglas* burden shifting analysis. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). As the Third Circuit Court of Appeals has explained, a plaintiff must meet his initial burden of establishing a prima facie case of employment discrimination by showing that

> (1) the plaintiff belongs to a protected class; (2) he/she was qualified for the position; (3) he/she was subject to an adverse employment action despite being qualified; and (4) under circumstances that raise an inference of discriminatory action, the employer continued to seek out individuals with qualifications similar to the plaintiff's to fill the position. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817; *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 348 n. 1, 352, 356 (3d Cir. 1999). However, the prima facie test remains flexible and must be tailored to fit the specific context in which it is applied. *Geraci v. Moody-Tottrup, Int'l, Inc.*, 82 F.3d 578, 581 (3d Cir. 1996).

*Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797-98 (3d Cir. 2003) (footnotes omitted). Once met, the burden then shifts to the employer to provide a nondiscriminatory reason for the employee's termination. *Id.* If the employer does so, the presumption of discriminatory action is rebutted, and the plaintiff must then establish that the reasons proffered by the employer are merely a pretext for discrimination and not the real motivation. *Id.* Claims brought under § 1981 follow

12

the same format. *Patterson v. McLean Credit Union*, 491 U.S. 164, 186 (1989); *Pamintuan v. Nanticoke Memorial Hosp.*, 192 F.3d 378, 385 (3d Cir. 1999).

It is uncontroverted that Plaintiff was qualified for his position and was subject to an adverse employment action; therefore, he meets the second and third elements of establishing a prima facie case of discrimination.

In the case of a plaintiff who is not a member of a protected class, the Court of Appeals has held that such an individual "should be able to establish a prima facie case ... by presenting sufficient evidence to allow a reasonable fact finder to conclude (given the totality of the circumstances) that the defendant treated plaintiff "less favorably than others because of [his] race, color, religion, sex, or national origin." *Iadimarco v. Runyon*, 190 F.3d 151, 163 (3d Cir. 1999) (quoting *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 577 (1978)). A claim of discrimination by a non-minority is analyzed under the same *McDonnell Douglas* standard and a non-minority claimant does not have to meet a "heightened standard" in making out a prima facie case. *Hopp v. City of Pittsburgh*, 194 F.3d 434, 438 (3d Cir. 1999).

Dollar challenges Plaintiff's prima facie case of reverse racial discrimination, contending that he cannot point to circumstances that would allow a fact finder to conclude that it treated him less favorably than others because of his race. It notes that the only evidence to suggest that Plaintiff was treated less favorably than other employees based on his race is his "feeling" that an African American employee who hung a monkey in the workplace would not have been terminated, and an allegation about two African American employees violating a "smoking rule."[21]  Moreover, Dollar contends that Plaintiff does not attempt to claim that these employees

---

[21] At his deposition, Plaintiff testified that he was "harassed and offended" by the fact that two African American employees working in the mailroom violated Dollar's no-smoking policy but were not fired and he assumes that they were among the employees who complained about the

engaged in conduct that was similar to his.

Plaintiff asserts, however, that the fact that he was replaced by an African American is sufficient to state a prima facie case. *Matczak v. Frankford Candy and Chocolate Co.*, 136 F.3d 933, 939 (3d Cir. 1997) (prima facie case may be satisfied by showing that the position was filled by a person not belonging to the same category as the plaintiff). Although Dollar argues that Plaintiff was not replaced by Mr. Gibson, Plaintiff correctly notes that Defendant's original interrogatory answer and the testimony of Ms. Herring-Myers—both of which stated that his position was filled by Mr. Gibson—are admissible to show the inconsistency with its amended interrogatory answer and the testimony of Mr. Mangis. *See Nye v. Ingersoll Rand Co.*, 2011 WL 5513190, at *7 (D.N.J. Nov. 9, 2011); *Alexander v. Del Monte Corp.*, 2011 WL 103560, at *1 (E.D. Mich. Jan. 12, 2011).

Viewing the conflicting evidence in the light most favorable to Plaintiff as the non-moving party, there is a genuine issue of material fact regarding whether he was replaced by an African American employee. This is sufficient to meet his initial burden. *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1069 (3d Cir. 1996) (en banc). Therefore, based upon all of the evidence presented, the Court concludes that Plaintiff has stated a prima facie case of reverse racial discrimination.

### 2. Reason for termination

The burden then shifts to Dollar to articulate a legitimate, non-discriminatory reason for its action. Dollar proffers Plaintiff's act of hanging a stuffed brown monkey in the workplace over the Martin Luther King, Jr. holiday weekend as its legitimate and non-discriminatory reason

---

monkey. (Plaintiff Dep. 70:1-71:1.) There is no evidence in the record, however, that these two employees were among those who complained. More importantly, Plaintiff does not contend that they are similarly situated individuals who received better treatment. Therefore, the Court need not address this evidence.

for Plaintiff's termination. Dollar asserts that Plaintiff's action, which offended two of his African American coworkers, violated Dollar's harassment policy and justified Plaintiff's termination. Dollar has thus satisfied its relatively light burden of production. *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 500-01 (3d Cir. 1997). The burden now shifts to Plaintiff to proffer evidence from which the trier of fact could conclude that Dollar's reason is a pretext for unlawful racial discrimination.

### 3. Pretext

In *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994), the Third Circuit Court of Appeals discussed the standards for assessing pretext. As it noted, the factual issue is "whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." The non-moving plaintiff must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them "unworthy of credence," and infer "that the employer did not act for [the asserted] non-discriminatory reasons." *Id.*

In disputing Dollar's motion for summary judgment, Plaintiff argues that he has submitted evidence from which a factfinder could reasonably (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. *Keller v. ORIX Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997) (en banc).

Plaintiff first argues that there is sufficient evidence to create a genuine issue of material fact about whether Dollar's articulated reasons for his termination are legitimate. In support of his contention, he notes that Dollar provided false information under oath prior to the

15

unemployment compensation hearing about the specific nature of his conduct. Indeed, it is undisputed that the information provided by Dollar in pre-hearing documentation was not true and was more inflammatory than Plaintiff's actual conduct. While Dollar claims that its false statement was a mistake, Plaintiff argues that the Court cannot make a credibility determination in the context of a motion for summary judgment. Plaintiff cites as further support for his position the fact that during discovery in this matter, Dollar attempted to conceal the fact that it replaced him with an African American employee. In addition, Plaintiff notes, Ms. Herring-Myers gave contradictory testimony about whether she decided to fire him before hearing his side of the story.

In *Fuentes*, the Court of Appeals noted that evidence submitted by a plaintiff to rebut the reasons proffered by an employer as legitimate must allow a factfinder to reasonably infer that each reason is either a "post hoc fabrication" or otherwise did not actually motivate the employment action. 32 F.3d at 764. In this case, however, Dollar's statement to the unemployment compensation authorities was not a "post hoc fabrication." Rather, the undisputed evidence demonstrates that Plaintiff engaged in certain conduct and was told that he was being fired for this reason. Although some of Dollar's later statements during the unemployment compensation process undoubtedly were not true, this does not change the fact that the act of hanging the monkey was the reason for his termination. Dollar's testimony at the unemployment hearing itself regarding the basis for his termination gave the same reason that Plaintiff was given at the time of his termination: he violated Dollar's harassment policy by hanging a monkey by its hands in the workplace over the Martin Luther King, Jr. holiday weekend. Thus, while the motivation for submitting a false recitation of Plaintiff's conduct indeed may be suspect, it does not represent a post-hoc fabrication that relates to the pivotal issue in this case, that is, Dollar's

reason for terminating Plaintiff.

Plaintiff also contends that Dollar has tried to "hide" the fact that he was replaced by an African American. The Court has already concluded that because there is conflicting evidence in the record with respect to Plaintiff's replacement, he has established a prima facie case of racial discrimination. At the same time, however, Dollar's inconsistent position does not establish pretext in this context. As Dollar points out in its Reply Brief, it initially provided discovery responses that stated that Plaintiff *was* replaced by an African American, and later changed its responses to reflect that he was not replaced by an African American. Regardless of which version is accurate, it is difficult to conceive that Dollar would initially admit in discovery that it replaced Plaintiff with someone of a different race if it was attempting to hide this fact. Moreover, even if it can be established that Plaintiff was replaced by Mr. Gibson, this does not create an issue of fact regarding whether Dollar's reason for terminating Plaintiff was a pretext for unlawful racial discrimination.

Plaintiff also bases his position regarding what he asserts to be a pretext for terminating him on the fact that Ms. Herring-Myers has given inconsistent testimony about whether she made the final decision to terminate his employment before hearing his side of the story. As he correctly points out, she testified both that she made the decision before meeting with him and that she had made a tentative decision but was willing to consider what Plaintiff had to say.[22]

However, drawing all inferences in Plaintiff's favor, even if Ms. Herring-Myers made the final decision to terminate Plaintiff's employment before he entered the room and nothing he could have said would have made any difference, this does not represent evidence that

---

[22] The Court recognizes that there are multiple inconsistencies in the testimony of Ms. Herring-Myers. However, her inconsistencies do not create a genuine issue of material fact regarding Plaintiff's conduct, Dollar's employment and harassment policies, or the reason why Plaintiff was terminated, nor do they support Plaintiff's claim of discrimination.

Defendant's reason for terminating him was a pretext for unlawful racial discrimination. Dollar's Employee Guide states that all forms of "visual" harassment are prohibited and that discipline, up to and including termination, is a possible consequence for policy violations. Dollar addressed a situation in which a white employee suspended a brown monkey from a wire rack in a shared workspace over the Martin Luther King, Jr. holiday weekend and in doing so, upset some of his African American co-workers, who perceived it as a racist gesture. Dollar concluded that Plaintiff's actions violated its harassment policy which, among other things, requires employees to consider their behavior and comments from the perspective of anyone who might be offended by them.[23]

The Court "do[es] not sit as a super-personnel department that reexamines an entity's business decisions. No matter how medieval a firm's practice, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, [discrimination laws such as Title VII do] not interfere." *Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 332 (3d Cir. 1995) (citation omitted). Thus, the issue is not whether Dollar was "right," whether it gave Plaintiff every benefit of the doubt or whether it was draconian in its decision to terminate his employment as opposed to some lesser sanction, but rather whether its proffered reason for terminating his employment is a pretext for unlawful racial discrimination. Therefore, even if the decision to terminate Plaintiff was made without giving him an opportunity to explain why he engaged in this conduct, Dollar could terminate him as long as it did not have a discriminatory basis for doing so. Plaintiff has failed to create a genuine issue of material fact that his

---

[23] There is inconsistent evidence in the record regarding Plaintiff's explanation for his actions. Plaintiff represents that he has never heard that monkeys have been used as a visual form of harassment to insult African Americans but acknowledged that hanging a monkey by a rope would represent such an image. Thus, at a minimum, he was aware that certain displays of a monkey can represent a racial meaning. (Plaintiff Dep. 65:3-13.)

termination was discriminatory.

The Court concludes that Plaintiff has failed to demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Burton v. Teleflex, Inc.*, 707 F.3d 417, 427 (3d Cir. 2013). The inconsistencies and contradictions on which Plaintiff relies to support his case fail to establish pretext because they do not refute Dollar's proffered legitimate reason for his termination: the suspending of a brown monkey from the ceiling in a shared workspace over the Martin Luther King, Jr. holiday weekend.

Plaintiff next argues that there is a genuine issue of material fact regarding whether there was a racial motivation for the decision to terminate his employment. He relies upon certain evidence to support his position. He notes that two African American employees assumed that he had hung the monkey before this was proven to be true, argues that Dollar assumed that because he is white, he could not have had a benign purpose, such as a Valentine's Day decoration, in hanging the monkey. He also references the fact that Ms. Herring-Myers admitted that she had hung pink and white monkeys on the door of her house for Valentine's Day.

The issue is this case are the actions taken by Dollar, not assumptions that may have been made by Plaintiff's coworkers.[24] It is undisputed that before terminating Plaintiff, Ms. Herring-Myers interviewed witnesses and reviewed the video tape which showed that Plaintiff was responsible for hanging the monkey. There is no evidence that Ms. Herring-Myers assumed that

---

[24] Defendant also argues that Plaintiff "had been repeatedly reprimanded in his performance reviews for inappropriate behavior, and it would be natural for his coworkers to make this assumption based upon Plaintiff's conduct, not his race." (ECF No. 29 at 5.) However, Ms. Herring-Myers testified that she did not review or consider his past performance appraisals and disciplinary history in connection with his termination (Herring-Myers Dep. 33:10-34:13). Regardless, what his co-workers assumed is not relevant and need not be considered.

Plaintiff was the responsible party before investigating the matter; in fact, she counseled his coworkers not to make draw any conclusions until she completed her investigation.

Plaintiff's second argument is similarly without merit. Plaintiff has cited no evidence that similarly situated employees of a different race have been or would be treated more favorably. His hypothetical conjecture regarding what would have happened if an African American employee had hung the monkey does not create a genuine issue of material fact. In addition, Plaintiff cannot rely on Ms. Herring-Myers' statement that she was offended as a black woman as support for the proposition that the decision was based on his race when the evidence is that it was based on his conduct. *See DeCarolis v. Presbyterian Med. Ctr. of Univ. of Pa. Health Sys.*, 554 F. App'x 100, 104 (3d Cir. Jan. 27, 2014) (white nurse who was terminated for circulating an email message critical of President Obama could not contend that the decision was based on her race as opposed to her conduct).

Finally, Plaintiff's argument based on Ms. Herring-Myers' "admission" that she hung pink and white monkeys on her door for Valentine's Day is meritless. She did so on February 7, one week before Valentine's Day, as opposed to Plaintiff's actions one month before Valentine's Day and over the Martin Luther King, Jr. holiday weekend. Her decorations were pink and white, colors typically associated with Valentine's Day, not brown and lacking any Valentine's Day indicia. Moreover, she used these decorations at home, not in the workplace. Simply put, the actions of Ms. Herring-Myers, which are substantially dissimilar from those of the Plaintiff, do not constitute evidence of pretext.

Plaintiff contends that the facts of this case are "remarkably similar" to those in *Ennis v. Delaware Transit Corp.*, 2015 WL 1542151 (Del. Super. Mar. 9, 2015). In that case, a Caucasian employee threw banana peels on the roof of a vehicle being used by several African American

co-workers. Perceiving this as a racist gesture, they complained to management. After an investigation, the plaintiff was terminated for violating defendant's harassment policy.

The court concluded that Ennis "narrowly satisfie[d] his burden in establishing a prima facie case" by pointing to testimony that implied that his race was relevant because throwing a banana peel on top of a vehicle "constituted a racist gesture by a white individual, and ... a black employee would not commit such an act." *Id.* at *6 (footnote omitted). The defendant proffered a legitimate, non-discriminatory reason for terminating his employment. However, the court found that "the number of weaknesses, implausibilities, and inconsistencies" in the record precluded summary judgment. *Id.* at *9.

In this case, by contrast, the "inconsistencies" in the record do not preclude summary judgment. There is insufficient evidence that would allow a reasonable factfinder to believe that Dollar did not truly act for the asserted reason. Plaintiff has not pointed to evidence from which a reasonable factfinder could conclude that its reason was fabricated or that discrimination was the motivating factor for Plaintiff's termination. Drawing all inferences in Plaintiff's favor, the undisputed evidence demonstrates that Plaintiff suspended a plain brown monkey from a wire rack in a common workplace over the Martin Luther King, Jr. holiday weekend, causing several African American co-workers to become upset and angry; Dollar's subsequent investigation confirmed that Plaintiff was responsible for hanging the monkey; and Dollar terminated him for violation of Dollar's harassment policy.

The Court concludes that Plaintiff has failed to proffer evidence that would allow a factfinder to infer that racial discrimination was more likely than not a motivating cause of the adverse employment action. Even assuming for the purposes of this opinion that Plaintiff has established a prima facie case of reverse discrimination, Dollar articulated a legitimate non-

discriminatory reason for its actions, that is, Plaintiff was terminated for inappropriately displaying a brown monkey in the workplace. Plaintiff has failed to elicit evidence from which a reasonable factfinder could conclude that Dollar's reason was fabricated or that discrimination was likely the motivating factor of his termination. Accordingly, Dollar is entitled to summary judgment in its favor.

Therefore, this 12th day of December, 2019, IT IS HEREBY ORDERED that the motion for summary judgment of Defendant Dollar Bank, FSB (ECF No. 19) is granted.

BY THE COURT:

PATRICIA L. DODGE
United States Magistrate Judge